# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, 1025 Vermont Ave., Suite 800 Washington, D.C., 20005, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as United States Secretary of Health and Human Services, 200 Independence Avenue, S.W. Washington, D.C., 20201, <br><br> DOROTHY FINK, in her official capacity as Acting Assistant Secretary for Health, 200 Independence Avenue, S.W. Washington, D.C., 20201, <br><br> AMY L. MARGOLIS, in her official capacity as Deputy Director of the Office of Population Affairs, 200 Independence Avenue, S.W. Washington, D.C., 20201, <br><br> Defendants. | No. 25-cv- |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (Challenge to unlawful withholding of Title X funds)

## INTRODUCTION

1.      The United States Department of Health and Human Services ("HHS" or "the Agency") has unlawfully withheld $65.8 million in Title X grants for federally funded family

planning services from sixteen Title X grantees. The Agency did so under the purported authority of a regulation, 45 C.F.R. § 75.371(a), that permits it to withhold funds only if it has determined that a grantee has failed to comply with "Federal statutes, regulations, or the terms and conditions of a Federal award" and, even then, only after HHS also "determines that noncompliance cannot be remedied by imposing additional conditions." 45 C.F.R. § 75.371. But HHS has not made any determination that the grantees have violated anything—let alone determined that any such violations cannot be remedied by imposing additional conditions. The withholding of funds was therefore contrary to law.

2.      In unlawfully withholding the funds, HHS has damaged and undermined Title X, the nation's only dedicated federally funded family planning program, leaving at least seven states—including the nation's most populous—without *any* provider of Title X family planning services.

3.      The consequences are devastating. As a result of the Agency's fund withholding, approximately 865 family planning service sites in the sixteen grantees' networks, across at least twenty-two states, are unable to provide Title X-funded services to an estimated 842,000 patients, the vast majority of whom have low incomes and, without Title X, risk being unable to access critical health care such as contraception, testing and treatment for sexually transmitted infections ("STIs"), and cancer screenings. Moreover, these 865 service sites face a cascade of damaging choices without Title X funds: removing some of the most effective family planning methods from availability, cutting services, reducing hours for appointments or limiting walk-in availability, limiting staff hours, cutting staff, and, finally, shutting down entirely.

4.      This began on March 31, 2025, when HHS abruptly issued letters notifying the sixteen Title X grantees that their 2025 noncompete continuation grants—which were due to start

on April 1, the next day, and which represent year-four funding of their 5-year competitive Title X grant awards—were being "temporarily withheld" pursuant to 45 C.F.R. § 75.371(a) (the "March 31 Letters" or "Letters"). Together, these sixteen grantees administer twenty-two grants, representing 25% of the eighty-six grant awards made in fiscal year ("FY") 2024. Fourteen of the sixteen grantees that were informed that their Title X grants were being withheld are members of Plaintiff National Family Planning & Reproductive Health Association ("NFPRHA") (the "Affected Members").

5.    The Letters explain that the withholding is premised on HHS's speculation about "possible violations" of the terms and conditions of the Affected Members' respective "notice[s] of award," specifically the requirement that Title X grantees administer their projects in compliance with federal civil rights laws, such as Title VI and Title VII, and Executive Orders. This speculation is, in turn, based solely on (1) one or two public statements from each Affected Member's website indicating support for diversity, equity, and inclusion and opposition to racism, which, HHS claims, "suggests" that the Affected Members are or may be engaged in conduct that violates federal civil rights laws; (2) a single public statement that HHS claims gives it "reason to believe" that some of the Affected Members may be providing care to undocumented immigrants, in violation of Executive Order 14218, "Ending Taxpayer Subsidization of Open Borders" ("EO 14218" or "the EO"); and (3) a professed desire to merely "assess" other Affected Members' compliance with EO 14218 generally.

6.    None of the March 31 Letters state that HHS has in fact determined that any of the Affected Members are violating (or have violated) any grant term or condition or any law. Instead, the Letters—issued just one day before FY 2025 funding was to begin on April 1—notify the Affected Members that their continuation grants are being preemptively withheld pursuant to 45

3

C.F.R. § 75.371(a) while the Agency "assess[es]" *whether* a violation of grant award terms has in fact occurred and, in order to perform that assessment, requests that the recipients submit a series of statements and documents—both from their own organizations as well as from all their sub-awardees—on an extremely tight 10-day timeline.

7.     The Affected Members received no advance notice that their funds were at risk of being withheld based on HHS's speculation as to "possible" violations of the terms of their grant awards, nor were they given any opportunity to undertake any voluntary corrective action to ensure compliance with any applicable statute, regulation, Executive Order, or grant award term or condition prior to the withholding of the funds, as required by law and HHS's own regulations.

8.     The Agency's withholding of funds pursuant to the Letters constitutes final agency action. It marks the consummation of the Agency's decision-making process as to whether to withhold Title X funds from select grantees and, if so, from which specific grantees to withhold funds. It also marks the consummation of the Agency's decision-making process as to the procedure and mechanism for withholding funds: specifically, it reflects the Agency's final decision that funds should be withheld from these specific grantees absent any advance notification of suspected non-compliance, any determination of actual non-compliance, or any opportunity for the grantees to voluntarily undertake corrective action that may be deemed necessary to comply. Rights and obligations have been determined by, and legal consequences flow from, the Agency's decision-making on these matters.

9.     HHS's decision to single out the Affected Members for adverse action, and to use 45 C.F.R. § 75.371(a) to withhold their grant funds in this manner, is patently unlawful. The *only* regulatory authority HHS cites in the Letters to justify its withholding of grant funds does not give it that authority under the circumstances present here. Section 75.371 permits HHS to temporarily

withhold payments to ensure compliance only *if* HHS has already *determined* that a grantee has *actually* failed to comply with "Federal statutes, regulations, or the terms and conditions of a Federal award" and—even then—only *after* HHS also "determines that noncompliance cannot be remedied by imposing additional conditions." 45 C.F.R. § 75.371. Here, HHS has not made any determination that any of the Affected Members are, in fact, violating anything, nor has it determined that any such violations cannot be remedied by imposing additional conditions.

10.    HHS's actions also violate the requirements set forth in other applicable laws and regulations pertaining to how HHS must effectuate compliance with Title VI within the federally funded programs it administers. Those requirements make clear that HHS may not withhold federal funds from a grantee for an alleged Title VI violation in an HHS program unless and until it has, at the very least, determined that an actual violation of Title VI has occurred, provided notice of the violation to the grantee, and determined that compliance cannot be secured through voluntary means. *See generally* 42 U.S.C. § 2000d-1; 45 C.F.R. § 80.8.

11.    The withholding of funds from the Affected Members pending an investigation to "assess" compliance is also arbitrary and capricious on multiple fronts. Specifically, the Agency has arbitrarily and irrationally: (1) singled out these specific Affected Members for withholding of funds without any reasoned justification; (2) failed to display any awareness of, let alone provide a reasonable explanation for, the Agency's apparent sudden departure from its own prior understanding of the meaning of Title VI and/or Title VII, as reflected in years of settled law, regulations, guidance, program documents, and past practice, and the core statutory purpose of Title X, which supports the longstanding, well-accepted practice of providing Title X services regardless of citizenship or immigration status or documentation, and thereby also ignored the impact that this sudden, previously unannounced departure has on Affected Members' associated

reliance interests; (3) incorrectly invoked Supreme Court precedent; (4) adopted an illogical and irrational process under which funds are withheld prior to: the provision of any guidance or rules as to how to comply under the Agency's seeming new view of federal civil rights law or the new Executive Order, any determination of actual non-compliance, any advanced notice of suspected non-compliance, and any opportunity to take any remedial or corrective action; (5) entirely failed to consider the serious and devastating nationwide harms and costs attributable to the unprecedented grant-withholding decision.

12.     Indeed, HHS's unlawful actions are already imposing serious and concrete harm on the Affected Members, their subrecipients, their staff, and Title X patients. The withholding of the Affected Members' grant awards has eliminated or reduced access to Title X services in vast swaths of the country. Indeed, because of the March 31 Letters, at least seven states are entirely without any Title X-funded services: California, Hawai'i, Maine, Mississippi, Missouri, Montana, and Utah. Fifteen more states currently have reduced or significantly reduced Title X access due to the withheld grants: Alaska, Connecticut, Idaho, Indiana, Kentucky, Minnesota, New Hampshire, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia, and West Virginia. The Affected Members and their subrecipients operate hundreds of Title X service sites across these states, which together provide family planning care to hundreds of thousands of low-income patients, many of whom would not otherwise be able to afford such care.  Depriving these individuals of the high-quality, essential health care provided by Title X-funded health centers reduces access to STI screening and treatment, cancer screening, and contraception, threatens the health and wellbeing of the individuals who rely on Title X for care, and undermines public health.

13.     Accordingly, HHS's withholding of the Affected Members' grant awards violates the Administrative Procedure Act ("APA"), as the Agency's action is not in accordance with law,

in excess of statutory authority, without observance of procedure required by law, and arbitrary and capricious, and, in the alternative, is an *ultra vires* act that disregards a specific and unambiguous statutory directive and violates a specific statutory command.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2), as the claims asserted arise under federal law, and 5 U.S.C. § 702, as the claims asserted challenge final agency action.

15.     This Court is authorized to issue injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

16.     This Court is also authorized to issue relief under the APA, 5 U.S.C. §§ 702, 705, 706, including vacating and setting aside the Letters pursuant to 5 U.S.C. § 706.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(C) because NFPRHA's corporate headquarters and principal place of business is in Washington, D.C.

18.     Venue is additionally proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(A) because each defendant is an agency of the United States or an officer thereof sued in their official capacity.

## PARTIES

### Plaintiff and Its Members

19.     Plaintiff NFPRHA is a national, non-profit membership association that advances and elevates the importance of family planning in the nation's health care system and promotes

and supports the work of family planning providers and administrators, especially those who provide care funded through government programs.

20.     NFPRHA represents nearly 900 organizational members in forty-seven states, Puerto Rico, and the District of Columbia. NFPRHA's membership includes state, county, and local health departments; private, non-profit family planning providers and administrators (including family planning councils, Planned Parenthood affiliates, and others); hospital-based health practices; and federally qualified health centers.

21.     Within Title X, NFPRHA's members operate or administer more than 3,000 health centers that provide family planning services to more than 2.2 million patients each year.

22.     NFPRHA brings this action in a representative capacity on behalf of its member organizations that participate in Title X, their staff, including clinicians, and the patients they serve.

23.     The interests that NFPRHA seeks to vindicate in this suit are central to its mission. NFPRHA is the lead national advocacy organization for the Title X family planning program and works to maintain Title X as a critical part of the public health safety net. In addition to its Title X advocacy, NFPRHA provides education, resources, and technical assistance to Title X grantees and subrecipients and concretely supports those entities as they implement Title X.

24.     NFPRHA has fourteen members that received the March 31 Letters, including Essential Access Health ("EAH") and Missouri Family Health Council ("MFHC"). EAH is California's only Title X grantee and has been the primary Title X family planning services grantee in the state since the 1970s. EAH administers a network of 354 service sites that deliver services to approximately 455,000 persons per year throughout California. It is also the sole Title X grantee for Hawaiʻi, serving thousands of patients at more than thirty service sites. MFHC is a private, nonprofit organization that has been a statewide Title X grant recipient in Missouri since the 1980s.

As the sole grantee for Missouri, MFHC funds and operates a network of fifty-two health centers serving approximately 36,000 persons a year across both urban and rural areas of Missouri. MFHC is also one of three grantees in Oklahoma for FY 2024, funding and operating a network of three service sites in the state that together serve approximately 9,100 persons per year, which amounts to approximately 73% of the total number of Title X patients served across the state.

25.    All of the Letters that the Affected Members received are substantially similar in substance, alleging possible violations of grant terms and conditions based on general public statements against racism and in support of diversity, equity, and inclusivity, and indicating either HHS's speculation of non-compliance with EO 14218 or a mere intention to "assess" compliance with EO 14218.

### Defendants

26.    Defendant Robert F. Kennedy Jr. is the United States Secretary of Health and Human Services ("the Secretary"), and he is sued in his official capacity. Secretary Kennedy is responsible for all aspects of the operation and management of HHS, including implementing and fulfilling HHS's duties under the United States Constitution, statutory law, and applicable regulations.

27.    HHS is an "agency" within the meaning of the Administrative Procedure Act. 5 U.S.C. § 551(1). HHS is the agency to which Congressional Title X funding is appropriated, *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 652 (2024), and is responsible for implementing Title X.

28.    Defendant Dorothy Fink is the Acting Assistant Secretary for Health and heads the Office of the Assistant Secretary for Health ("OASH"), an office within HHS, and she is sued in

her official capacity. Defendant Fink develops policy recommendations pertaining to public health issues relevant to HHS and its offices.

29.     OASH was identified in the March 31 Letters as the entity providing notice that the Affected Members' Title X grant awards were being withheld.

30.     Defendant Amy L. Margolis is the Deputy Director of the Office of Population Affairs ("OPA"), an office within HHS and within the purview of OASH, which administers and oversees the Title X program, and she is sued in her official capacity. Defendant Margolis's signature block and/or signature is on the March 31 Letters.

## FACTUAL ALLEGATIONS

### A.  Overview of the Title X Program

31.     Title X became law as part of the "Family Planning Services and Population Research Act of 1970." Pub. L. No. 91-572, 84 Stat. 1504 (1970). It was, and remains, the only dedicated source of federal funding for family planning services in the United States. The program provides high-quality family planning and sexual health care to all, with priority given to the low-income patients the program was established to serve. Title X provides access to effective contraceptive methods, cancer screenings, testing and treatment for STIs, other preventive services, and, fundamentally, the education and clinical care needed to either achieve or prevent pregnancy—decisions made by patients according to their needs and values.

32.     For over half a century, Title X funding has built and sustained a national network of family planning health centers that deliver critical preventive health care. It has enabled millions of low-income patients to both achieve and prevent pregnancy. For many people, Title X-funded

care is the only health care they seek. In 2016, approximately 60% of patients sampled in a survey reported that a Title X health center was their only source of health care in the previous year.[1]

33.    Many Title X-funded organizations have been providing care in the network for decades, often from the very beginning of the Title X program in 1971. Title X health care providers have accordingly developed deep expertise and high responsiveness to patient needs.

34.    In 2023, more than 3,800 Title X sites around the country served 2.8 million patients, with more than 4.3 million family planning visits.[2] Title X patients are disproportionately low-income, with the majority having incomes at or below the federal poverty level. *See* 2023 FPAR at 12–13. The program also serves a racially and ethnically diverse population; Title X patients are disproportionately African American and Latino/as, as compared to the general U.S. population.

35.    Indispensable to our nation's health care safety net, Title X plays a key role in ensuring that patients get the care they need without cost being a barrier, offering no-cost family planning and sexual health services to patients at or below 100% of the federal poverty level ($15,650 per year for a single-person household in 2025).[3]

---

[1] Managi Lord-Biggers & Amy Friedrich-Karnik, *Features and Benefits of the Title X Program*, Guttmacher Institute (Feb. 2025), https://www.guttmacher.org/fact-sheet/features-and-benefits-title-x-program.

[2] *See* Phil Killewald et al., Off. of Population Affs., Off. of the Assistant Sec'y for Health, U.S. Dep't of Health & Human Servs., Family Planning Annual Report: 2023 National Summary 10 (2024) [hereinafter "2023 FPAR"], https://opa.hhs.gov/sites/default/files/2024-10/2023-FPAR-National-Summary-Report.pdf.

[3] Off. of the Assistant Sec'y for Plan. & Evaluation, *Poverty Guidelines*, U.S. Dep't of Health & Human Servs., https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines (last visited Apr. 21, 2025).

**B. Title X Grant-Making**

36.     Section 1001 of Title X authorizes the Secretary of HHS to fund "public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). These Title X grants support Title X "projects" for particular geographic locations. Within each Title X project, there are typically three levels: (1) the grantee entity, (2) subrecipient organizations, and (3) individual health centers, or service sites, operated either directly by the grantee or run by subrecipients.

37.     In making grants, the statute specifies that "the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." 42 U.S.C. § 300(b).

38.     A grant for a family planning services project can be made only upon assurances from the grantee that "(1) priority will be given in such project" to furnishing services to persons from low-income families and "(2) no charge will be made in such project . . . for services provided to any person from a low-income family except to the extent that payment will be made by a third party . . . authorized or [] under legal obligation to pay such charge." 42 U.S.C. § 300a-4(c).

39.     Federal regulations also instruct that "[t]he Federal awarding agency must communicate to the non-Federal entity all relevant public policy requirements, including those in general appropriations provisions, and incorporate them either directly or by reference in the terms and conditions of the Federal award," so as to ensure that "Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements." 45 C.F.R. § 75.300(a).

40.    In 2021, OPA announced the availability of grant funds for Title X services.[4] In the Notice of Funding Opportunity ("NOFO"), OPA solicited applications for projects to provide Title X services, offered an overview of the program's requirements and priorities, and detailed how applications would be assessed. *See* NOFO.

41.    In addition to requiring compliance with applicable federal laws and regulations, OPA made clear that grant recipients were required to adhere to its "program priorities," which "represent overarching goals for the Title X program." *Id.* at 9.

42.    OPA's first program priority for Title X was to "[a]dvance health equity through the delivery of Title X services." *Id.* OPA specified that advancing health equity for "people from low-income families, people of color, and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality" was "a priority for HHS, for OPA, and for the Title X program." *Id.* OPA's "focus[] on advancing equity in the Title X program" was intended to "create opportunities to support communities that have been historically underserved, which benefits everyone." *Id.*; *see also* 42 C.F.R. § 59.7(a)(3) (HHS will take into account "[t]he ability of the applicant to advance health equity" in assessing Title X grant applications).

43.    Reflecting the importance of its health equity priority, all applicants for Title X grants were required to "[d]escribe plans and strategies for providing family planning services that address" the goal of "[a]dvancing health equity throughout the delivery of Title X family planning services." NOFO at 19. In addition, "as a part of [the] effort to advance health equity," all applicants were required to develop a "disparity impact statement," which is "part of a

---

[4]  *See* Jessica Swafford Marcella, Deputy Assistant Sec'y for Population Affs., Off. of Population Affs., Notice of Funding Opportunity: Title X Family Planning Services Grants (2021) [hereinafter "NOFO"], https://static1.squarespace.com/static/62991439185270517b7b57fb/t/63 e5566f1807b308a7f9e5ad/1696613921087/NOFO+2022.pdf.

comprehensive data-driven approach for identifying and addressing health disparities to promote health equity for racial and ethnic minority populations." *Id.* at 10, 52.

44.     Funds under the FY 2022 competitive NOFO were to be awarded for a period of performance of up to five years, to be funded in annual increments (called budget periods), though the budget period could vary from 12 months. *Id.* at 12. The NOFO explains that to obtain funds for subsequent budget periods of the approved period of performance, successful applicants who are awarded grants would be required to submit noncompeting continuation grant applications that include "a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." *Id.* at 47.

45.     A successful applicant for a Title X grant is issued a Notice of Award ("NOA"), which informs the grantee of its selection, the amount of the award, the project and initial budget period, and any conditions on the award.[5]

46.     The NOA also contains standard general terms and conditions, reporting requirements, and contact information for relevant officials at the Agency. *See id.* at 12–13; *see also* 45 C.F.R. § 75.210.

47.     Pursuant to HHS regulations governing grant funding, the NOAs include a provision requiring compliance with "statutory, executive order, other Presidential directive, or regulatory requirements." 45 C.F.R. § 75.210(b)(1)(ii).

48.     Many regulatory requirements—in effect at the time of the FY 2022 competitive application, throughout successive budget periods, and currently—reflect HHS's emphasis on advancing inclusivity and health equity through the Title X program. For example, the Agency's

---

[5] *See* Off. of Population Affs., Title X Program Handbook 12 (2024) [hereinafter "Title X Handbook"], https://opa.hhs.gov/sites/default/files/2025-01/Title%20X%20Program%20 Handbook_Dec%202024_FINAL.pdf.

regulations require that "[e]ach project supported" in the Title X program "[p]rovide services in a manner that is client-centered, culturally and linguistically appropriate, inclusive, and trauma-informed." 42 C.F.R. § 59.5(a)(3); *see also id.* § 59.2 (defining "[i]nclusive," and "[c]ulturally and linguistically appropriate services").

49.    HHS also defines "[q]uality healthcare" as healthcare that is not only safe and effective but also "equitable," and defines "[h]ealth equity" to mean "when all persons have the opportunity to attain their full health potential and no one is disadvantaged from achieving this potential because of social position or other socially determined circumstances." 42 C.F.R. § 59.2.

50.    The Title X regulations further instruct that each Title X project must "[p]rovide for opportunities for community education, participation, and engagement to," *inter alia*, "[p]romote continued participation in the project by diverse persons to whom family planning services may be beneficial to ensure access to equitable, affordable, client-centered, quality family planning services." 42 C.F.R. § 59.5(b)(3)(iii).

51.    Other program documents express similar sentiments. For example, the NOAs themselves contain a standard clause entitled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government," which provides:

> You must administer your project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age and, in some circumstances, religion, conscience, and sex (including gender identity, sexual orientation, and pregnancy). This includes taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities.

52.    The Title X Handbook further instructs, in line with the NOFO, that "[a]dvancing equity for all, including people from low-income families, people of color, and others who have

been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, is a priority for HHS, OPA, and Title X." Title X Program Handbook at 12.

53.    The latest update of the Recommendations of the U.S. Office of Population Affairs for Providing Quality Family Planning Services in the United States (Revised 2024) ("QFP"), also "includes newer approaches to care by adopting a health equity lens and recognizing the impact of structural and interpersonal racism, classism, ableism, and bias based on sexual orientation and/or gender identity on health and [sexual and reproductive health] care."[6] The QFP, initially published in 2014, is a nationally recognized clinical standard for family planning care; Title X-funded entities have been required to adhere to QFP standards since 2014. *See* Title X Program Handbook at 10.

54.    Moreover, Title X's core statutory purpose is to help make "comprehensive voluntary family planning services readily available to all persons desiring such services." Pub. L. No. 91-572, § 2(1). This foundational principle has meant that the Title X program has long provided services to people without regard to citizenship or immigration status or documentation.[7]

---

[6] Sarah E. Romer et al., *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs (Revised 2024)*, 67 Am. J. Prev. Med. S41, S42 (2024) [hereinafter "QFP"], https://pubmed.ncbi.nlm.nih.gov/39570204/.

[7] *See, e.g.*, Elayne J. Heisler & Abigail F. Kolker, Noncitizens' Access to Health Care 24 (2024), https://www.congress.gov/crs-product/R47351; Institute of Medicine (US) Committee on a Comprehensive Review of the HHS Office of Family Planning Title X Program, *4, Program Management and Administration*, *in* A Review of the HHS Family Planning Program: Mission, Management, and Measurement of Results, (Adrienne Stith Butler & Ellen Wright Clayton, eds., 2009) 101, https://www.ncbi.nlm.nih.gov/books/NBK215218/ (citing 42 C.F.R. § 59.5(a)(4) and noting "Title X clinics therefore meet the reproductive health care needs of adolescents, men, recent legal immigrants, and the undocumented, who might otherwise forego family planning services").

**C. The March 31 Letters**

55.    Title X grantees' non-competing continuation applications for funding for FY 2025 were due by January 6, 2025. Such applications are virtually always granted. Grantees anticipated receiving NOAs approving their continuation grant applications in mid- to late March of 2025.

56.    However, on March 31, 2025, Defendant Margolis sent the Letters to the Affected Members "providing notice that disbursement under [each Affected Member's] Title X grant award[] is being temporarily withheld based on possible violations of the terms and conditions set forth in the notice of award, pursuant to 45 C.F.R. [§] 75.371(a)." *See, e.g.*, Letter from Amy Margolis, Deputy Director, OPA, to Essential Access Health (Mar. 31, 2025) (attached to the Complaint as Exhibit A); Letter from Amy Margolis, Deputy Director, OPA, to Missouri Family Health Council, Inc. (Mar. 31, 2025) (attached to the Complaint as Exhibit B).

57.    The Letters quote a portion of the standard non-discrimination clause in Affected Members' NOAs, which requires "compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, [and] national origin." *Id.* The Letters then state that a "[r]eview of public materials posted by" the Affected Members "suggests [they] may be engaged in conduct that violates Title VI [and/or] Title VII of the Civil Rights Act." *Id.* Ostensibly in support of such an allegation, the Letters provide links to one or two pages on each of the Affected Member's websites. *Id.*

58.    The Affected Members' cited public statements broadly describe the organizations' commitment to diversity, equity, and inclusion in a manner contemplated by and consistent with Title X regulations and program documents, and in a manner similar to the public statements, policies, and practices of numerous other Title X grantees, and other entities in the field of public health and across various other sectors.

59. Nevertheless, the Letters state that such material "indicates" or suggests that the Affected Members may be engaged in "widespread practices across hiring, operations, and patient treatment that 'unavoidably employ race in a negative manner.'" *Id.* (citing *Students for Fair Admissions v. Harvard*, 600 U.S. 181, 230 (2023)).

60. Additionally, the Letters reference EO 14218 §§ 1, 2(i), which, they state, "sets forth a policy to remove incentives for illegal immigration by ensuring that taxpayer-funded benefits are not provided to illegal aliens." *Id.* However, they make no actual finding of noncompliance with respect to the EO. *Id.*

61. Moreover, on its face, and by its own terms, EO 14218 does not impose any obligations or requirements directly on Title X grantees. Rather, the EO directs "the head of each executive department or agency" to undertake action related to certain noncitizens' use of federally funded programs. EO 14218. Specifically, § 2(i), requires *the Agency* to identify federal programs that extend benefits to certain noncitizens and to take "appropriate actions" "consistent with applicable law" to conform those programs to the EO. *Id.* As of the filing of this lawsuit, HHS has not promulgated any regulations, or even issued informal guidance, implementing EO 14218, explaining how the EO impacts the operation of the Title X program, or notifying Title X grantees as to what they must do to comply with EO 14218 in the context of providing Title X services.

62. The Letters go on to cite 45 C.F.R. § 75.371(a) as a basis for "withholding payments under all captioned awards effective as of the date of th[e] letter[s]," and state that "OASH will communicate with [the Affected Members] to assess the existence and scope of practices that violate civil rights laws and to ensure compliance" and to assess the same or "ensure compliance" with EO 14218. *See, e.g.*, Exs. A, B.

63.     The Letters then request an extensive list of documents, most of which relate to whether the Affected Members' organizations have received any complaints or grievances alleging discrimination based on race and, if so, how the Affected Members' organizations handle such complaints or grievances. *Id*. The Letters request such information not merely from the Affected Members but also "all [their] sub-awardees," and instruct the Affected Members to produce the requested documents "within 10 days." *Id*.

64.     The Letters do not conclude that any Affected Member *actually violated* any federal law or regulation or Executive Order. Rather, the Letters refer solely to HHS's speculation as to hypothetical violations. *See id.* (referring to unspecified "possible violations" and asserting that the Affected Members's speech "suggests" that they "may be engaged in" impermissible conduct that constitutes "a likely violation" of the grant terms).

**D. There Is No Authority for HHS to Withhold the Title X Grant Awards**

**a. 45 C.F.R. § 75.371 Does Not Authorize Defendants' Action**

65.     The sole basis for Defendants' withholding of the Affected Members' Title X grant awards cited in the Letters—45 C.F.R. § 75.371—does not permit the action Defendants undertook here.

66.     Section 75.371 is one of the implementing regulations applicable to all HHS grant awards. *See* 45 C.F.R. pt. 75. These regulations "establish[] uniform administrative requirements, cost principles, and audit requirements for Federal awards to non-Federal entities." *See* 45 C.F.R. § 75.100(a)(1).

67.     As relevant here, these regulations contain rules governing "[r]emedies for noncompliance." *Id.* § 75.371. Specifically, the relevant provision provides,

> If a non-Federal entity fails to comply with Federal statutes,
> regulations, or the terms and conditions of a Federal award, the HHS

> awarding agency or pass-through entity may impose additional conditions . . . . If the HHS awarding agency or pass-through entity determines that noncompliance cannot be remedied by imposing additional conditions, the HHS awarding agency or pass-through entity may take one or more of the following actions, as appropriate in the circumstances . . .

*Id.*

68.     The "actions" referenced in that provision include: (1) temporarily withholding cash payments pending correction of the deficiency by the non-Federal entity or more severe enforcement action by the HHS awarding agency; (2) disallowing, *i.e.*, denying the use of funds for, all or part of the cost of the activity or action not in compliance; (3) wholly or partly suspending or terminating the award; (4) initiating suspension or debarment proceedings as authorized by regulation; (5) withholding further Federal awards for the project or program; (5) taking other remedies that may be legally available. *See id.* § 75.371(a)-(f).

69.     HHS failed to comply with the foregoing requirements.

70.     First, although the Agency cited § 75.371 as its only justification for withholding the Affected Members' awards, it failed to adhere to the plain text of that provision: withholding of grant money is a permitted remedy only "*[i]f* a non-Federal entity *fails* to comply with Federal statutes, regulations, or the terms and conditions of a Federal award." *Id.* § 75.371 (emphasis added). The March 31 Letters make abundantly clear that the Agency has not yet actually determined whether any Affected Member has in fact "fail[ed] to comply" with anything.

71.     Second, even after the Agency has decided that a grantee has failed to comply, the withholding of funds under § 75.371 is permitted only "*[i]f* the HHS awarding agency . . . determines that noncompliance cannot be remedied by imposing additional conditions." *Id.* (emphasis added). Because the Letters *do not* conclude that the Affected Members have, in fact, failed to comply with anything, HHS could not possibly have "determine[d]" that withholding of

funds was the only means to remedy a failure to comply. And it certainly did not provide the Affected Members with any opportunity to "remed[y]" a finding of non-compliance by implementing "additional conditions" prior to withholding their funds.

### b. HHS Failed to Follow the Statutory and Regulatory Procedures for Enforcing Title VI Within Federally Funded Programs

72.    All Title X grantees, including Plaintiff NFPRHA's members, are required to comply with federal anti-discrimination laws, as set out in the standard term in their NOAs and applicable Title X regulations. *See, e.g.*, 42 C.F.R. § 59.5(a)(4). That obligation includes compliance with Title VI of the Civil Rights Act, which, in relevant part, provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

73.    As detailed above, *see supra* ¶¶ 56–62, the March 31 Letters state HHS's belief that the Affected Members may have possibly committed unspecified violations of Title VI and that HHS's decision to withhold funds is premised at least in part on this speculative noncompliance.

74.    However, HHS regulations provide that the Agency "must comply with any requirements for hearings, appeals or other administrative proceedings to which the non-Federal entity is entitled under any statute or regulation applicable to the action involved." 45 C.F.R. § 75.374(a). In other words, where, as here, the Agency is suggesting that a grantee has failed to comply with a specific federal statute or regulation, HHS must adhere to any procedural requirements applicable under those provisions of law. The Agency failed to do so.

75.    Congress authorized and directed HHS to effectuate these anti-discrimination provisions by issuing regulations intended to ensure compliance with Title VI by grantees while they carry out HHS-funded activities within a given grant program. *See* 42 U.S.C. § 2000d-1

(directing agencies that provide federal financial assistance to issue rules and regulations implementing 42 U.S.C. § 2000d).

76.     However, Congress mandated that, before HHS may enforce compliance with Title VI through the "termination of or refusal to grant or to continue assistance under" a grant program, there must be "an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement." *Id.* In addition, while also permitting HHS to effectuate compliance "by any other means authorized by law," Congress *prohibited* the Agency from taking "such action . . . until the . . . [A]gency . . . has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." *Id.*

77.     In response to Congress's directive, HHS promulgated a set of regulations that govern compliance with Title VI in all programs funded by the Agency, entitled "Nondiscrimination Under Programs Receiving Federal Assistance Through the Department of Health and Human Services Effectuation of Title VI of the Civil Rights Act of 1964." *See* 45 C.F.R. pt. 80 *et seq.* These regulations "appl[y] to any program to which Federal financial assistance is authorized to be extended to a recipient under a law administered by" HHS. 45 C.F.R. § 80.2.

78.     The regulations provide that the Agency "shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients to help them comply voluntarily with this part." *Id.* § 80.6(a). Only "[i]f there appears to be a failure or threatened failure to comply with this regulation, *and* if the noncompliance or threatened noncompliance cannot be corrected by informal means," *id.* § 80.8(a) (emphasis added), may HHS effectuate compliance "by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law." *Id.*

79.    Moreover, the regulations instruct that no order "suspending, terminating or refusing to grant or continue Federal financial assistance" shall become effective until: (1) the Agency "has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means"; (2) "there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part"; and (3) "the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action." *Id.* § 80.8(c)(1)-(3).

80.    HHS's regulations provide additional procedures for the hearings required by 45 C.F.R. § 80.8(c)(2), *see id.* § 80.9, as well as for decisions by hearing examiners, *see id.* § 80.10; the regulations also provide for judicial review of such decisions, *see id.* § 80.11.

81.    The regulations also permit HHS to employ "any other means authorized by law" to effectuate compliance with Title VI, *id.* § 80.8(a), provided that the Agency take "[n]o action to effect compliance by any other means authorized by law . . . until": (1) the Agency "has determined that compliance cannot be secured by voluntary means"; (2) the grantee "has been notified of its failure to comply and of the action to be taken to effect compliance"; and (3) "the expiration of at least 10 days from the mailing of such notice," during which time, "additional efforts shall be made to persuade [the grantee] to comply with the regulation and to take such corrective action as may be appropriate." *See id.* § 80.8(d)(1)-(3).

82.    The Agency utterly failed to adhere to the process that Congress—and HHS itself—has established for withholding funds based on Title VI violations.

83.    To the extent the Agency's action is viewed as one of refusing to "continue assistance" under Title X, it was required by law and regulation to (1) determine that the grantee has actually failed to comply, *see, e.g.*, 45 C.F.R. § 80.8(c); 42 U.S.C. § 2000d-1; (2) provide notice to the grantee of the determination that it has failed to comply, 45 C.F.R. § 80.8(c)(1); (3) determine that compliance could not be secured by voluntary means, *id.*; (4) provide an "opportunity for hearing," *id.* § 80.8(c)(2); 42 U.S.C. § 2000d-1; (5) make an "express finding on the record"—at the conclusion of that hearing—that the grantee has in fact failed to comply with the requirement, *id.*; (6) file with the relevant House and Senate committees a full written report of the circumstances and grounds for the action, 45 C.F.R. § 80.8(c)(3); 42 U.S.C. § 2000d-1; and (7) wait at least 30 days after the filing of the report before letting any order refusing to continue assistance take effect, *id.*

84.    The Agency did none of this before withholding the grant funds.

85.    Moreover, to the extent the Agency's action is instead construed as using "other means authorized by law" for effecting compliance, the Agency was required by law and regulation to (1) determine that the grantee has actually failed to comply, *see, e.g.*, 45 C.F.R. § 80.8(d); 42 U.S.C. § 2000d-1; (2) determine that compliance cannot be secured by voluntary means, 45 C.F.R. § 80.8(d)(1); 42 U.S.C. § 2000d-1; (3) provide notice to the grantee of the determination of non-compliance and of the action to be taken to effect compliance, 45 C.F.R. § 80.8(d)(2); 42 U.S.C. § 2000d-1; and (4) wait at least 10 days from the mailing of that notice, during which time the Agency must engage in additional efforts to persuade the grantee to comply and take any appropriate corrective action, 45 C.F.R. § 80.8(d)(3).

86.    The Agency did none of this before withholding the grant funds.

**E.  The March 31 Letters Impose Severe and Irreparable Harm and Costs**

87.     The March 31 Letters inflict serious harm on NFPRHA's Affected Members and their subrecipients—and, in turn, on their Title X staff and Title X patients—by depriving them of up to approximately $61,600,000 that would have otherwise been spent providing critically needed family planning services in FY 2025. This deprivation of funds is already having devastating consequences.

88.     Because of the Agency's withholding of funds, 865 Title X service sites—over 22% of the total—have no Title X-funded services. Those 865 sites serve an estimated 842,000 patients a year, which is approximately 30% of *all* Title X patients for 2023 (the most recent year for which data is available). These losses frustrate the purpose of the program, hamper capacity and the provision of health care, and hurt patients who rely on those sites for access to vital Title X-funded family planning services.

89.     Recent history has shown the consequences of losing a significant number of grantees and service sites. Following implementation of the 2019 Title X Final Rule in mid-2019, nineteen grantees withdrew from the Title X program and another eighteen grantees reported significant losses to their service networks.[8] This resulted in the loss of more than 1,000 Title X service sites, and left six states without any Title X services available and another seven states with Title X services available on a very limited basis. *See* 2023 FPAR at 10; 2022 FPAR at xv. Due in significant part to these losses, Title X went from serving approximately 3.9 million patients in 2018 to just 1.5 million in 2020. *See* 2023 FPAR at 10.

---

[8] A. Clochard et al., Off. of Population Affs., Off. of the Assistant Sec'y for Health, U.S. Dep't of Health & Human Servs., Title X Family Planning Annual Report: 2022 National Summary xv (2023) [hereinafter "2022 FPAR"], https://opa.hhs.gov/sites/default/files/2023-10/2022-FPAR-National-Summary.pdf.

90.     Some Affected Members and/or their health centers simply do not have the resources to continue to operate for a month or longer without Title X funding, and so even if the withheld Title X funds are eventually released, it might well be too late for them if they have laid off staff or closed health centers. Other Affected Members may need to significantly reduce services and hours in order to stay in operation.

91.     The Agency entirely failed to consider or acknowledge these harms.

92.     The allegations of the preceding paragraphs are incorporated by reference in the following claims.

## FIRST CAUSE OF ACTION

### (Violation of APA – Not in Accordance with Law, 5 U.S.C. § 706(2)(A))

93.     The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This includes action that is contrary to or violative of the Agency's own "existing valid regulations." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Battle v. F.A.A.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005) ("*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others.").

94.     The Agency's withholding of funds constitutes final agency action subject to judicial review. It marks the "consummation" of the agency's decision-making process as to whether to withhold continuation grants from particular grantees, and by what specific process or mechanism, and rights and obligations are determined by, and "legal consequences" flow from, that final decision. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

95.     The Agency's withholding of funds is contrary to 45 C.F.R. § 75.371, which instructs that the Agency must make an actual determination of non-compliance *and* a

26

determination that "non-compliance cannot be remedied by imposing additional conditions," *prior to* withholding grant funds.

96.    The Agency's withholding of funds is also contrary to 42 U.S.C. § 2000d-1, which applies to any federal agency seeking to effect compliance with Title VI of the Civil Rights Act in a federally funded program it administers. 42 U.S.C. § 2000d-1 mandates that *prior to* taking any action to terminate a grant, refuse to grant, or refuse to continue assistance to a grantee in order to effect compliance with Title VI, (1) there must have been an Agency determination of non-compliance; (2) there must have been an express finding on the record, after the opportunity for a hearing, of a failure to comply; and (3) at least 30 days must have elapsed from when the Agency filed a full written report with the relevant congressional committees as to the circumstances and grounds for the action. 42 U.S.C. § 2000d-1 further instructs that *prior to* the Agency effecting compliance with Title VI through "any other means authorized by law," it must similarly first make an actual determination that the grantee has in fact failed to comply, advise the grantee of that failure to comply, and make a second determination that compliance cannot be secured by voluntary means.

97.    The Agency's withholding of funds is also contrary to 45 C.F.R. § 80.8—the Agency's own regulations implementing 42 U.S.C. § 2000d-1—which mandate that "[n]o order suspending, terminating or refusing to grant or continue Federal financial assistance [based on noncompliance with Title VI] shall become effective," unless and until (1) the Agency has made an actual determination that the recipient is not in compliance, (2) the Agency has advised the recipient of the compliance failure and has determined that compliance cannot be secured by voluntary means, (3) there has been an express finding on the record, after the opportunity for a hearing, of a failure to comply, and (4) at least 30 days have elapsed from when the Agency filed

a full written report with the relevant congressional committees as to the circumstances and grounds for the action. 45 C.F.R. § 80.8(c). The regulations further provide that "[n]o action to effect compliance by any *other* means authorized by law," shall be taken until (1) the Agency has made an actual determination that the recipient is not in compliance, (2) the Agency has determined that compliance cannot be secured by voluntary means; (3) the grantee has been notified of its failure to comply and of the action to be taken to effect compliance; and (4) at least 10 days have elapsed from the mailing of such notice to the grantee, during which time the Agency must make additional efforts to persuade the grantee to comply and to take such corrective action as may be appropriate. 45 C.F.R. § 80.8(d) (emphasis added).

98.    The Agency has withheld funds from the Affected Members in a manner that is contrary to what is required by applicable federal law and regulations, as detailed above. Accordingly, the Agency's action of withholding funds is "not in accordance with law" and must be set aside as unlawful under the APA. 5 U.S.C. § 706(2)(A).

99.    As a result of Defendants' unlawful conduct, Plaintiff's members, their staff, and the individuals they serve have suffered and will continue to suffer irreparable harm.

### SECOND CAUSE OF ACTION

### (Violation of APA – In Excess of Statutory Authority, 5 U.S.C. § 706(2)(C))

100.    The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

101.    The Agency's withholding of funds constitutes final agency action subject to judicial review. It marks the "consummation" of the agency's decision-making process as to whether to withhold continuation grants from particular grantees, and by what specific process or

mechanism, and rights and obligations are determined by, and "legal consequences" flow from, that final decision. *Bennett*, 520 U.S. at 177–78.

102.    As detailed above, the Agency's withholding of funds exceeds the Agency's statutory authority under 42 U.S.C. § 2000d-1, which sets forth specific requirements with which the Agency must comply prior to any action withholding funds to effectuate compliance with Title VI taking effect.

103.    Accordingly, the Agency's action of withholding funds must be set aside as unlawful agency action under the APA. 5 U.S.C. § 706(2)(C).

104.    As a result of Defendants' unlawful conduct, Plaintiff's members, their staff, and the individuals they serve have suffered and will continue to suffer irreparable harm.

### THIRD CAUSE OF ACTION

### (Violation of APA – Without Observance of Procedure Required by Law, 5 U.S.C. § 706(2)(D))

105.    The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

106.    The Agency's withholding of funds constitutes final agency action subject to judicial review. It marks the "consummation" of the agency's decision-making process as to whether to withhold continuation grants from particular grantees, and by what specific process or mechanism, and rights and obligations are determined by, and "legal consequences" flow, from that final decision. *Bennett*, 520 U.S. at 177–78.

107.    As detailed *supra* ¶¶ 65–86, the Agency has withheld funds from the Affected Members "without observance of procedure[s] required by law," specifically 42 U.S.C. § 2000d-1, 45 C.F.R. § 75.371, and 45 C.F.R. pt. 80 *et seq*.

108.    Accordingly, the Agency's action of withholding funds must be set aside as unlawful agency action under the APA. 5 U.S.C. § 706(2)(D).

109.    As a result of Defendants' unlawful conduct, Plaintiff's members, their staff, and the individuals they serve have suffered and will continue to suffer irreparable harm.

## FOURTH CAUSE OF ACTION

**(Violation of APA – Arbitrary, Capricious, and Abuse of Discretion; 5 U.S.C. § 706(2)(A))**

110.    The APA provides that courts "shall . . . hold unlawful and set aside" final agency action that is "arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).

111.    The Agency's withholding of funds constitutes final agency action subject to judicial review. It marks the "consummation" of the agency's decision-making process as to whether to withhold continuation grants from particular grantees, and by what specific process or mechanism, and rights and obligations are determined by, and "legal consequences" flow from, that final decision. *Bennett*, 520 U.S. at 177–78.

112.    The APA's bar on arbitrary and capricious agency actions "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

113.    Moreover, the APA prohibits an agency from "depart[ing] from a prior policy *sub silentio*." *FCC v. Fox Television Studios, Inc.*, 556 U.S. 502, 515 (2009); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (holding that "an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice'") (citation omitted). Not only must a change in policy be justified by reasoned decision-making, but the agency must provide a "more detailed justification than what would suffice for a new policy created on a blank slate," where "its prior policy has

engendered serious reliance interests that must be taken into account." *Fox Television Studios, Inc.*, 556 U.S. at 515.

114.    The Agency's withholding of funds is arbitrary and capricious because it provided no reasoned explanation or justification for the withholding of funds from these specific Affected Members, disregarded material facts and longstanding reliance interests, and failed to consider important aspects of the problem.

115.    First, the Agency's withholding of funds is arbitrary and capricious because it withheld grants from the Affected Members based on language contained in their public materials that aligns with requirements and instructions set forth in the Title X regulations and Title X program documents.

116.    Second, the Agency's withholding of funds is arbitrary and capricious because it did not provide any awareness of, or reasonable explanation for, its seeming sudden departure from its own prior understanding of the meaning of Title VI and/or Title VII of the Civil Rights Act of 1964, as reflected in: (1) years of settled law, regulations, guidance, and past practice; (2) the settled understanding of the current Title X regulations and program documents—all of which demonstrate a clear intent to account for and further diversity, equity, and inclusion in the Title X program; and (3) Title X's core statutory purpose of making "comprehensive voluntary family planning services readily available to all persons desiring such services," Pub. L. 91-572, § 2(1), which supports the associated longstanding practice of providing Title X services regardless of citizenship or immigration status or documentation.

117.    In so doing, the Agency also failed to acknowledge or account for Plaintiff's members' well-established reliance interests based on (1) the Agency's own prior understanding of Title VI and/or Title VI, as reflected in years of settled law, regulations, guidance, and past

practice, including the current Title X regulations and program documents; and (2) the purpose of the Title X program of making "comprehensive voluntary family planning services readily available to all persons desiring such services," Pub. L. 91-572, § 2(1), irrespective of citizenship or immigration status or documentation. *See Regents of the Univ. of Cal.*, 591 U.S. at 33 (holding that an agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").

118.    Third, the Agency's withholding of funds is arbitrary and capricious to the extent that the Agency relies on *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) to support an interpretation of Title VI and/or Title VII under which any diversity, equity, or inclusion or anti-racism statements, programming, or policy is considered unlawful, because the Supreme Court's decision in that case does not support that interpretation, and existing case law makes clear that such policies remain lawful.

119.    Fourth, the Agency's withholding of funds is arbitrary and capricious because the process the Agency invoked for ensuring compliance with federal civil rights laws and EO 14218 within the Title X program is illogical and irrational. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action must be logical and rational). There is no rational reason to deprive hundreds of thousands of low-income individuals of necessary health care, for which Congress has appropriated funds, prior to (1) the issuance of any rule or guidance as to how to comply with HHS's new view of federal civil rights law and with new EO 14218 § 2(i); (2) the issuance of any advance notice of suspected non-compliance; (3) an actual determination of non-compliance; and/or (4) an opportunity to take any remedial or corrective action.

120.    Fifth, the Agency's withholding of funds is arbitrary and capricious because the Agency has failed to consider the enormous costs its withholding decision imposes, including significant costs to Plaintiff's members, their staff, and Title X patients in at least twenty-two states, particularly those who cannot otherwise access necessary family planning care.

121.    Accordingly, the Agency's action of withholding funds is arbitrary and capricious and must be held unlawful and set aside. 5 U.S.C. § 706(2)(A).

122.    As a result of Defendants' unlawful conduct, Plaintiff's members, their staff, and the individuals they serve have suffered and will continue to suffer irreparable harm.

### FIFTH CAUSE OF ACTION

### (*Ultra Vires* – No Legal Authority of Agency's Action)

123.    In the alternative to violating the APA, the Agency's action of withholding funds is unlawful because it is an *ultra vires* exercise of the Agency's power.

124.    Congress has explicitly set out the specific mechanism that federal agencies must utilize to effectuate compliance with Title VI of the Civil Rights Act, as it applies to federally funded programs that they administer, in 42 U.S.C. § 2000d-1.

125.    As detailed above, the Agency has withheld funds from the Affected Members in a manner that "disregard[s] [that] specific and unambiguous statutory directive, [and] that violate[s] [that] specific command of [the] statute." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (internal citations omitted).

126.    Thus, pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Agency's action is *ultra vires* because it the Agency lacks legal authority to withhold funds in the manner it did.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(A)     Declare unlawful and set aside the Agency's withholding of funding pursuant to the March 31 Letters;

(B)     Declare that Defendants have violated the statutes and regulations governing the Title X program and compliance with Title VI within federally funded programs by withholding funds from the Affected Members without having first provided them with notice of possible violations and an opportunity to undertake any necessary voluntary corrective action, and without first having made an evidence-based determination that they are violating (or have violated) any grant term or condition or any law;

(C)     Award injunctive relief prohibiting Defendants from withholding funds from NFPRHA's members without having first provided them with notice of possible violations and an opportunity to undertake any necessary voluntary corrective action, and without first having made an evidence-based determination that they are violating (or have violated) any grant term or condition or any law;

(D)     Award Plaintiff its costs and its attorney's fees in bringing this action pursuant to 28 U.S.C. § 2412; and

(E)     Grant such other or further relief as this Court may deem just and proper.

April 24, 2025,

                                          Respectfully submitted,

                                          */s/ Arthur B. Spitzer*

Arthur B. Spitzer (D.C. Bar No. 235960)
Aditi Shah (D.C. Bar No. 90033136)*
American Civil Liberties Union
  of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: (202) 601-4266
aspitzer@acludc.org
ashah@acludc.org

Robin Summers (D.C. Bar No. 219473)
National Family Planning & Reproductive Health
Association
1025 Vermont Ave. NW, Suite 800
Washington, D.C. 20005
T: (202) 293-3114
rsummers@nfprha.org

Brigitte Amiri**
Meagan Burrows**
Ryan Mendias**
Nora Ellmann**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2500
bamiri@aclu.org
mburrows@aclu.org
rmendias@aclu.org
nellmann@aclu.org

*Attorneys for Plaintiff*

*Admission to D.D.C. Bar pending
**Pro hac vice motions forthcoming*