# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>ROBERT F. KENNEDY, JR., *et al.*,  )<br><br>Defendants.  ) | No. 1:25-cv-01265 (ACR) |

**DECLARATION OF CLARE M. COLEMAN IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Clare M. Coleman, declare and state as follows:

1. I am the President and CEO of the National Family Planning & Reproductive Health Association ("NFPRHA"), the Plaintiff in the above-captioned case. I submit this declaration in support of NFPRHA's motion for partial summary judgment.

**NFPRHA and Its Membership**

2. NFPRHA is a national, non-profit membership association that advances and elevates the importance of family planning in the nation's health care system and promotes and supports the work of family planning providers and administrators, especially those that provide care funded through government programs. I have led NFPRHA for more than 15 years.

3. NFPRHA represents nearly 900 organizational members in forty-seven states, Puerto Rico, and the District of Columbia. NFPRHA's membership includes state, county, and local health departments; private, non-profit family planning providers and administrators

1

(including family planning councils, Planned Parenthood affiliates, and others); hospital-based health practices; and federally qualified health centers.

### The Title X Program & NFPRHA's Title X Role

4. Title X of the Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, 84 Stat. 1504 (1970), 42 U.S.C. § 300 *et seq.*, is the nation's only dedicated federally funded family planning program. Title X provides access to effective contraceptive methods, cancer screenings, testing and treatment for sexually transmitted infections ("STIs"), and other preventive health services.

5. While Title X provides high-quality family planning and sexual health care to all, priority is given to the low-income patients that the program was established to serve, who pay nothing or on a sliding scale for Title X-funded care.

6. Title X patients are disproportionately young people, people of color, and people with low incomes, with the majority of Title X patients having incomes at or below the federal poverty level.

7. For many Title X patients, Title X-funded health centers are their only source of medical care.

8. Title X grants support Title X "projects" in geographically defined locations. Within each Title X project, there are typically three levels: (1) the grantee entity, (2) subrecipient organizations, and (3) individual health centers, or service sites, operated either directly by the grantee or run by subrecipients.

9. Title X grantees may receive one grant for a Title X project that serves one state; one grant for a Title X project that serves multiple states; or multiple grants for Title X projects

that serve multiple states. Some states may also be served by multiple Title X projects operated by different Title X grantees.

10. Within Title X, NFPRHA's members operate or administer more than 3,000 health centers that provide family planning services to more than 2.2 million patients each year.

11. NFPRHA is the lead national advocacy organization for the Title X family planning program and a vital component of NFPRHA's mission involves working to maintain Title X as a critical part of the public health safety net. In furtherance of its mission and purpose, NFPRHA engages in Title X advocacy, provides education, expert resources, and technical assistance to Title X grantees and subrecipients, and supports the work of those entities on an ongoing basis as they implement Title X.

12. In my capacity as President and CEO of NFPRHA, I routinely communicate with NFPRHA member Title X grantees and subrecipients to discuss challenges they are facing. These frequent interactions inform my knowledge of and insight into the impact of the challenged Title X grant withholdings, discussed below, on NFPRHA's members. Moreover, since March 2025 I have been in regular conversation with NFPRHA's affected grantees attempting to help them navigate financial and operating challenges caused by the withholdings. I also regularly review the latest Title X data made publicly available by the Office of Population Affairs ("OPA"), including funding awards, Title X users, and service sites.

13. Additionally, my personal experience as a former leader of a Title X-funded subrecipient agency gives me a first-hand understanding of the kinds of choices that NFPRHA members have had to face in terms of their finances, staffing, services, and operating hours resulting from the loss of Title X funds due to the challenged withholdings.

## The Current Title X Grant Cycle

14. For the current competitive Title X grant award, the Department of Health and Human Services ("HHS"), through the OPA, announced the availability of grant funds for Title X services through a Notice of Funding Opportunity ("NOFO") in late 2021, with grants to begin in April 2022.[1]

15. Funds under the fiscal year ("FY") 2022 competitive Notice of Funding Opportunity ("NOFO") were awarded for a period of performance of up to five years, to be funded in annual increments, called budget periods.

16. Successful applicants awarded grants in FY 2022 were issued initial Notices of Award ("NOAs"), informing them of their selection as Title X grantees, award amounts, the project period of performance and initial budget period dates, and containing standard and special terms and conditions, reporting requirements, and contact information for relevant officials at HHS.

17. To obtain funds for subsequent budget periods of the approved period of performance, grantees are required to submit noncompeting continuation grant applications that include "a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." NOFO at 47.

18. When these continuation grant applications are granted—as they virtually always are—grantees are issued a new NOA for that budget period, often within days of the budget period start date.

19. Title X grantees' non-competing continuation applications for funding for FY 2025 were due by January 6, 2025, for the budget period beginning April 1, 2025. Fifty-eight members

---

[1] *See* Jessica Swafford Marcella, Deputy Assistant Sec'y for Population Affs., Off. of Population Affs., Notice of Funding Opportunity: Title X Family Planning Services Grants (2021) [hereinafter "NOFO"], https://static1.squarespace.com/static/62991439185270517b7b57fb/t/63 e5566f1807b308a7f9e5ad/1696613921087/NOFO+2022.pdf.

4

of NFPRHA submitted non-competing continuation applications for FY 2025 funding by the January 6, 2025, deadline, representing nearly 75% of all Title X grantees funded at that time.

20. NFPRHA member grantees that submitted FY 2025 non-competing continuation applications expected to receive new NOAs approving their applications in late March of 2025.

### The March 31, 2025 Letters

21. However, on March 31, 2025, sixteen Title X grantees received letters from OPA Deputy Director Amy Margolis informing them that the Office of the Assistant Secretary for Health ("OASH") was withholding their continuation grants—twenty-two grants in total—pending investigation into *possible* violations of grant terms and conditions, including the requirement that Title X grantees administer their project in compliance with federal civil rights laws (the "March 31 Letters").

22. Fifteen of the sixteen Title X grantees that had grants withheld pursuant to the March 31 Letters are currently NFPRHA's members (the "Affected Members"): AccessMatters; Adagio Health; Bridgercare; Converge; Essential Access Health; Maine Family Planning; Missouri Family Health Council; Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky; Planned Parenthood of Minnesota, North Dakota, and South Dakota; Planned Parenthood of Northern New England; Planned Parenthood of Southern New England; Planned Parenthood of South Atlantic; Planned Parenthood Association of Utah; The Virginia League for Planned Parenthood; and Planned Parenthood of Greater Ohio.[2]

---

[2] When this case was initially filed, fourteen of the sixteen Title X grantees that had their funding withheld were NFPRHA members. However, during the week of July 21, 2025, one additional affected grantee—Planned Parenthood of Greater Ohio—became a member of NFPRHA. Accordingly, as of the date of this declaration, fifteen of the sixteen Title X grantees that initially had funding withheld on March 31, 2025 are currently NFPRHA members and, as discussed below, as of the date of this declaration, eight of NFPRHA's members continue to have grants withheld.

23. All of the March 31 Letters received by NFPRHA's Affected Members are substantially similar in substance to the letter received by NFPRHA member Missouri Family Health Council, Inc. ("MFHC"). *See* Letter from Amy Margolis, Deputy Director, OPA, to MFHC (Mar. 31, 2025), attached hereto as Exhibit A.

24. The eight Planned Parenthood Affected Members that had grants withheld received a single March 31 Letter, addressed to all of them.

25. While the Planned Parenthood Affected Members' March 31 Letter claims that certain public materials posted by Planned Parenthood members suggest that they may be engaged in conduct that violates Title VI and Title VII of the Civil Rights Act, the Letter fails to identify *any* public materials posted by five of the eight Planned Parenthood Affected Members that continue to have grants withheld.

26. Prior to receipt of the March 31 Letters, NFPRHA's Affected Members had received no notice from HHS indicating that HHS suspected they were out of compliance with any terms or conditions of their grants or that their grants were at risk of being withheld on that basis, nor were they provided any opportunity to voluntarily remedy any suspected violation.

27. Further, prior to the withholding of NFPRHA's Affected Members' Title X grants pursuant to the March 31 Letters, none of NFPRHA's Affected Members were provided an opportunity for a hearing to contest any alleged failure to comply with the requirements of federal civil rights law, nor was there any express finding made on the record following a hearing that any of NFPRHA's Affected Members actually failed to comply with any federal civil rights law.

28. Likewise, to my knowledge, HHS did not file any written reports detailing the circumstances and grounds for withholding funds from any of NFPRHA's Affected Members with

6

any House or Senate committee, nor did HHS wait 30 days from the filing of any such reports prior to withholding NFPRHA's Affected Members' funds.

29.     During my more than 15 year tenure at NFPRHA, no Title X grantee has had its continuation grant withheld pending investigation into compliance with the terms and conditions of the grant. In fact, on the rare occasion that HHS has undertaken an investigation into a Title X grantee's compliance with terms and conditions, HHS has continued to fund the grantee during the pendency of the investigation and has provided the grantee with an opportunity to come into compliance prior to withholding or terminating the provision of funds.

### The June 25, 2025, and July 23, 2025, Letters

30.     On June 25, 2025, four of NFPRHA's Affected Members received letters from OPA Deputy Director Amy Margolis informing them that the OASH was restoring their previously withheld Title X grants. Those four Affected Members are: Essential Access Health, MFHC, Converge, and Adagio.

31.     The four Affected Members that received letters informing them that their grants were being restored subsequently received NOAs and their grant funds were disbursed to them.

32.     However, also on June 25, 2025, eleven of NFPRHA Affected Members received letters informing them that their grant funds would remain withheld based on possible violations of the terms and conditions of their grants and requesting additional information to assess compliance.

33.     Subsequently, on July 23, 2025, three of those remaining eleven Affected Members received letters from OPA Deputy Director Amy Margolis informing them that the OASH was also

restoring their previously withheld Title X grants. Those three Affected Members are: Maine Family Planning, Bridgercare, and AccessMatters.[3]

34. However, as of the date of this declaration, eight of NFPRHA's Affected Members remain subject to the withholding of their Title X grants.

35. The eight Affected Members that continue to have grants withheld are: Planned Parenthood Great Northwest, Hawaii, Alaska, Indiana, and Kentucky; Planned Parenthood of Minnesota, North Dakota, and South Dakota; Planned Parenthood of Northern New England; Planned Parenthood of Southern New England; Planned Parenthood of South Atlantic; Planned Parenthood Association of Utah; The Virginia League for Planned Parenthood; and Planned Parenthood of Greater Ohio.

### The Severe Harm Caused by Withholding of Continuation Grants

36. The withholding of grant funds pursuant to the March 31 Letters has inflicted and continues to inflict severe harm on NFPRHA's Affected Members and their subrecipients—and, in turn, on their Title X staff and Title X patients—by depriving them of tens of millions of dollars that would have otherwise been spent providing critically needed Title X family planning services in FY 2025, and that would be spent on such services if the remaining withheld grant funds are restored.

37. Pursuant to the March 31 Letters, approximately $65.8 million in Title X grant funds were withheld from sixteen Title X grantees. As a result, between April 2025 and the end of June 2025 when NFPRHA's first four Affected Members had their funding restored, approximately 865 family planning service sites in the sixteen grantees' networks across twenty-

---

[3] As of the date of this declaration, these three Affected Members are still awaiting receipt of their NOAs and disbursement of their Title X grant funds.

three states—which together compromise 22% of the total Title X service sites nationwide—were unable to provide Title X-funded services. Those 865 sites serve an estimated 842,000 patients a year, the vast majority of whom have low incomes.

38. The inability of those 865 service sites to provide Title X services severely frustrated the purpose of the program, hampered capacity and the provision of Title X-funded health care, and hurt patients who relied on those sites for access to vital Title X-funded family planning services.

39. Notwithstanding the restoration of Title X grants to seven of NFPRHA's fifteen Affected Members, similarly severe and irreparable harm persists today.

40. Indeed, as of the date of this filing, approximately $18.3 million in Title X grant funds remain withheld from eight of NFPRHA's Affected Members.

41. As a result, approximately 80 family planning service sites in those eight Affected Members' networks remain unable to provide Title X-funded services to an estimated 158,720 patients per year. One state—Utah—is still entirely without any Title X-funded services, and twelve more states still have reduced or significantly reduced Title X access due to the withheld grants: Alaska, Connecticut, Idaho, Indiana, Kentucky, Minnesota, New Hampshire, North Carolina, Ohio, South Carolina, Texas, and Virginia.

42. Moreover, since April, as a result of the withholding of their Title X funding, several of NFPRHA's Affected Members and/or their subrecipients have been forced to lay off staff members, eliminate or reduce the provision of certain services, reduce hours, adjust their sliding fee scales (thereby rendering certain services more expensive or unaffordable for low-income patients), and/or shut down health centers entirely.

43. Based on my personal experience as the CEO of a health center network that provided Title X services, I know that when health centers are forced to lay off valuable, highly trained staff members or close down a site, it is next-to impossible for the agency to later re-hire and re-open. Due to a nationwide shortage of health care providers, clinicians and other health center staff move quickly to jobs with other health providers, including hospitals and private practices where they frequently earn substantially more than they were able to earn working in a safety-net setting. Closing a site means giving up the lease or selling the property, laying off or reassigning staff to other locations (if possible for the agency and the employee), and selling off the equipment. In my time as CEO of a Title X-funded health network, I did three rounds of layoffs and closed four health centers. Some of the non-clinical staff who were laid off lost access to health insurance; some had to take two jobs to replace the earnings from the job they had at the health centers.

44. The withholding of Title X funds from NFPRHA's Affected Members also, in turn, seriously harms Title X patients by delaying their access to vital preventative health care and increasing the cost of that care, and in some cases may prevent them from accessing health care entirely. When my agency closed down the health centers, patients who had been seen at those sites were asked to travel to our other locations. Patients were also given information about safety-net providers in the area, but those health centers did not provide the breadth of family planning services that Title X-funded health centers provide. Nearly 16 years later, the health centers that were closed have not re-opened.

45. Depriving patients of essential health care funded by Title X threatens the health and wellbeing of the individuals who rely on Title X for care and seriously undermines public health.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of July 2025.

                                                                              /s/ Clare M. C_____
                                                                              Clare M. Coleman